UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LONDA CLAYBON, as Independent Administrator for the Estate of Carrie Claybon, Deceased, | No. 20-cv-04507 |
| Plaintiff, | Judge Thomas M. Durkin |
| v. | |
| SSC WESTCHESTER OPERATING COMPANY LLC, a Foreign Limited Liability Company d/b/a Westchester Health and Rehabilitation Center, | |
| Defendant. | |

**MEMORANDUM ORDER AND OPINION**

Pursuant to the Illinois Survival Act, 755 ILCS 5/27-6, Plaintiff Londa Claybon ("Plaintiff") brings this action as independent administrator for the estate of Carrie Claybon ("Claybon") against Defendant SSC Westchester Operating Company LLC d/b/a Westchester Health and Rehabilitation Center. Plaintiff alleges that Claybon contracted COVID-19 and later died from the virus as a result of Westchester's purported violations of the Illinois Nursing Home Care Act, 210 ILCS 45/1–101 *et seq*. Westchester moves to dismiss and strike the complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f). For the following reasons, Westchester's motion to dismiss is denied, while its motion to strike is denied in part and granted in part.

**Background**

This case arises out of the COVID-19 pandemic and the circumstances surrounding it. In March 2020, when the pandemic began to take shape, Carrie

1

Claybon, then 81 years-old, lived at the Westchester Health and Rehabilitation Center. As a nursing home, Westchester employs nurses and staff who are largely responsible for the care of residents like Claybon.

Plaintiff alleges that starting on or around March 9, 2020, several members of Westchester's nursing staff began to show symptoms of COVID-19. At least one member tested positive for the virus, while another was hospitalized. Westchester allegedly knew that multiple staff members were symptomatic, and also knew about the positive test result, but nevertheless instructed staff—including the diagnosed nurse—to report to work. On March 16, after several staff members informed Westchester of their symptoms, Claybon told her providers that she had developed a "dry and unproductive cough" and experienced shortness of breath. She ran a fever of 102 degrees the following week and died a few days later.

Plaintiff largely blames Westchester for Claybon's death. She points to the decision requiring symptomatic nurses to report to work, and alleges that personal protective equipment ("PPE")—including masks, gowns, and face shields—were either not provided to Westchester staff or misplaced. She also claims that Westchester failed to implement pandemic-related guidelines issued by the Center for Medicare & Medicaid Services, and further alleges that Westchester had been repeatedly cited by the Illinois Department of Public Health between 2011 and 2019 for issues concerning infection control practices.

As the events at Westchester were unfolding in March 2020, Illinois Governor J.B. Pritzker was issuing a series of proclamations and executive orders related to

pandemic. Invoking his authority under the Illinois Emergency Management Agency Act ("EMAA"), 20 ILCS 3305/1 *et seq.*, Governor Pritzker issued his first proclamation on March 9, declaring Illinois a disaster area and directing state agencies to coordinate their response efforts. The proclamation noted that COVID-19 is a novel illness and that certain populations, including the elderly and those with serious chronic medical conditions, were at a higher risk of developing more severe illness as a result of the virus. The proclamation also noted that the World Health Organization had already reported more than 100,000 confirmed cases of COVID-19 worldwide, and that at least 11 people in Illinois had been diagnosed with the virus, with an additional 260 individuals designated as persons under investigation.

On April 1, 2020, just days after Claybon died, Governor Pritzker issued Executive Order 2020-19 that again declared Illinois a disaster area, and directed health care facilities to "render assistance" in support of the State's response efforts (hereinafter the "Executive Order"). The Executive Order explained that "rendering assistance" must "include measures such as increasing the number of beds, preserving personal protective equipment, or taking necessary steps to prepare to treat patients with COVID-19." Notably, Section 3 of the Executive Order extended partial civil immunity to health care facilities for:

> "any injury or death alleged to have been caused by any act or omission by the Health Care Facility, which injury or death occurred at a time when a Health Care Facility was engaged in the course of rendering assistance to the State by providing health care services in response to the COVID-19 outbreak, unless it is established that such injury or death was caused by gross negligence or willful misconduct of such Health Care Facility, if 20 ILCS 3305/15 is applicable, or by willful misconduct, if 20 ILCS 3305/21 is applicable."

3

As referenced in the Executive Order, 20 ILCS 3305/15 grants partial immunity to certain government actors who render assistance during an emergency, while 20 ILCS 3305/21(c) extends immunity to "[a]ny private person, firm or corporation," such as Westchester, that "renders assistance or advice at the request of the State" during "an actual or impending disaster" unless the "person, firm or corporation" engaged in "willful misconduct."

Against this backdrop, Plaintiff brings two claims against Westchester under the Illinois Nursing Home Care Act—one for negligence, the other for willful and wanton misconduct. Westchester moved to dismiss both claims and filed a motion to strike several of the allegations in the complaint. The Court turns to those motions now.

## Standard

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.,* 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

4

plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

## Analysis

### I. Motion to Dismiss

#### A. Count I - Negligence

A plaintiff bringing a claim for negligence must plausibly allege "[1] the existence of a duty owed by defendant to the plaintiff, [2] a breach of that duty, and [3] an injury proximately caused by that breach." *Parker v. Illinois Masonic Warren Barr Pavilion*, 701 N.E.2d 190, 193 (Ill. App. Ct. 1998) (analyzing negligence claim brought under the Illinois Nursing Home Care Act). Broadly speaking, Plaintiff alleges that Westchester: (1) owed Claybon several duties related to her health and well-being; (2) breached those duties by failing to implement infection control and prevention procedures; and (3) caused Claybon to contract and later die from COVID-19.[1]

---

[1] As stated, Plaintiff in this case is Londa Claybon, who serves as independent administrator of Carrie Claybon's estate. However, throughout Plaintiff's opposition brief, counsel repeatedly refers to Carrie Claybon as Lottie Smith and discusses allegations involving Ms. Smith that do not appear in Plaintiff's complaint. *See, e.g.*, R. 23 at 6, 9, 13. The Court believes that these references were included in Plaintiff's brief by mistake since counsel has filed a substantially similar case against Westchester involving Ms. Smith. *See Brady v. SSC Westchester Operating Company LLC*, 20-CV-04500, Dkt. 1 (N.D. Ill.

In its motion to dismiss, Westchester does not dispute the sufficiency of Count I's allegations. Instead, Westchester argues that it is immune from liability under the Executive Order. *See* R. 14 ¶¶ 11-13; R. 25 at 6-7. As stated earlier, the Executive Order relieves health care facilities of liability from injuries or death caused by "any act or omission" other than "gross negligence or willful misconduct" that occurred while the facility "render[ed] assistance to the State by providing health care services in response to the COVID-19 outbreak." Westchester claims that it rendered assistance to the State by "attempt[ing]" to "increase the number of beds . . . preserve personal protective equipment, and . . . take [the] necessary steps to prepare to treat patients with COVID-19." *See* R. 14 ¶ 12.

The problem with this argument is that whether Westchester actually assisted the State in response to the pandemic is a factual question that cannot be resolved at this stage in the proceedings. *See Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1038 (N.D. Ill. 2018) (whether defendant was entitled to immunity could not be decided on motion to dismiss); *Cage v. Harper*, 2018 WL 4144624, at *5 (N.D. Ill. Aug. 30, 2018) (noting that "[i]mmunity defenses typically rely on the facts of the case"); *Dobrzeniecki v. Salisbury*, 2012 WL 1531278, at *6 (N.D. Ill. Apr. 27, 2012) (factual dispute over immunity defense precluded Rule 12(b)(6) dismissal). Indeed, all well-pleaded allegations are accepted as true on a motion to dismiss, and Plaintiff alleges here that Westchester did *not* render assistance in response to the pandemic. *See* R.

---

July 31, 2020). Plaintiff's counsel is reminded to review documents for accuracy and clarity before filing them with the Court.

1 ¶¶ 11-16. Furthermore, Westchester does not argue that it assisted the State; rather, it argues that it "attempt[ed]" to assist the State. *See* R. 14 ¶ 12. This argument raises more questions than it answers—did the attempt succeed? What was the scope of the attempt? When did the attempt occur? Although Westchester filed an affidavit in support of its motion, the affidavit is barebones and does not shed any light on Westchester's "attempts" to render assistance. *See* R. 14-6.

Aside from these factual questions, there is also the potential issue of retroactive applicability. Claybon allegedly died on March 30, 2020 while the Executive Order was filed and went into effect on April 1, 2020. The Executive Order grants limited immunity to health care facilities through "the pendency of the Gubernatorial Disaster Proclamation," and purportedly includes in its definition of "Gubernatorial Disaster Proclamation" the declaration that went into effect on March 9. This seems to suggest that the Executive Order applies retroactively, and therefore covers events before April 1, but the text of the Executive Order is less than clear and neither party has briefed the issue.

This is not to say that a court can never grant a motion to dismiss on immunity grounds. Granting such a motion may be appropriate when the immunity question can easily be resolved from the face of the complaint. *See, e.g.*, *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (affirming Rule 12(b)(6) dismissal because detectives were entitled to qualified immunity); *Remet Corp. v. City of Chicago*, 509 F.3d 816, 819 (7th Cir. 2007) (affirming motion to dismiss because city was entitled to tort immunity). But when the key facts of a dispute are tied up in the immunity analysis,

7

as is the case here, "dismissal at the pleading stage" is often "inappropriate." *Alvarado v. Litscher*, 267 F.3d 648, 651-52 (7th Cir. 2001); *see also Jacobs v. City of Chi.*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal."). Because the Court cannot determine at this stage and on this record whether the Executive Order shields Westchester from liability, and because Westchester does not offer any other basis for dismissal, the motion as it relates to Count I is denied.[2]

### B. Count II - Willful and Wanton Misconduct

That brings us to Count II, which is styled in the complaint as "Illinois Nursing Home Care Act – Willful and Wanton." Plaintiff brings this claim in the alternative to Count I since the Executive Order immunizes "negligent" conduct but not "gross negligence or willful misconduct."

Westchester argues that Count II should be dismissed because the Act does not expressly recognize a cause of action for "willful and wanton" misconduct.

---

[2] The introduction section to Westchester's reply brief asserts, without more, that Plaintiff has "declined to file a certificate of merit as required by 735 ILCS 5/2-622." *See* R. 25 at 3. That provision of Illinois law requires a plaintiff bringing a malpractice claim to file, among other things, a certificate from a qualified health professional stating that "there is a reasonable and meritorious case" supporting the claim. *See* 735 ILCS 5/2-622. To the extent Westchester believes that Plaintiff's complaint should be dismissed because Plaintiff did not file a certificate of merit, that argument is waived since it appeared for the first time in Westchester's reply brief. *See Hernandez v. Cook Cty. Sheriff's Off.*, 634 F.3d 906, 913 (7th Cir. 2011). Even if the Court were to consider Westchester's argument on the merits, it still fails because the Illinois Supreme Court has held that plaintiffs "who assert private rights of action under the Nursing Home Care Act are not required to" file a certificate of merit. *Eads v. Heritage Enterprises, Inc.*, 787 N.E.2d 771, 780 (Ill. 2003).

Westchester correctly points out that Section 3-601 of the Act holds nursing homes liable for "any intentional or negligent" conduct that injures a resident, and does not otherwise refer to the words "willful" or "wanton," *See* 210 ILCS 45/3-601.[3] But what Westchester neglects to mention is that when a word is defined in a statute, it "must be construed by applying the statutory definition provided by the legislature." *People v. Fiveash*, 39 N.E.3d 924, 928 (Ill. 2015). And here, the Act defines "neglect" as "a facility's failure to provide, *or willful withholding of*, adequate medical care . . . personal care, or assistance with activities of daily living that is necessary to avoid physical harm."[4] 210 ILCS 45/1-117 (emphasis added). At a minimum, then, the plain language of the statute contemplates willful misconduct, and finds it actionable under certain conditions. What is more, the Illinois Supreme Court has repeatedly recognized that common law punitive damages are available for "willful and wanton" violations of the Act. *See, e.g.*, *Vincent v. Alden-Park Strathmoor, Inc.*, 948 N.E.2d 610, 615 (Ill. 2011) (noting that "[i]t has become a settled principle of Illinois law" that common law punitive damages are available for "willful and wanton" misconduct); *Eads*, 787 N.E.2d at 777 (similar). There is little reason to think that the Illinois Supreme Court would reach this conclusion, and continue to reinforce it,

---

[3] 210 ILCS 45/3-601 provides in its entirety: "The owner and licensee are liable to a resident for any intentional or negligent act or omission of their agents or employees which injures the resident."

[4] The statute does not provide a separate definition for "negligent," which is the word that appears in Section 3-601. But "neglect" is a derivative of "negligent," so it stands to reason that the statute's definition of "neglect" applies to "negligent."

9

if "willful and wanton" violations were not recognized under the statute. The Court accordingly finds Westchester's first argument unavailing.

Westchester argues next that the allegations supporting Count II do not sufficiently demonstrate that the nursing home engaged in "willful and wanton" behavior or "intentional" misconduct. *See* 210 ILCS 45/3-601 (proscribing "any intentional or negligent act or omission" that injures a resident). Although the term "intentional" is not defined in the Act, the word generally means "a desire to cause consequences or at least [a] substantially certain belief that the consequences will result." *Ziarko v. Soo Line R. Co.*, 641 N.E.2d 402, 405 (Ill. 1994). "Willful and wanton" similarly includes intentional conduct, but also encompasses a "reckless disregard for the safety of others," such as failing to take reasonable precautions after having knowledge of an impending danger. *See id.*

These definitions resonate here. As stated earlier, Westchester allegedly: (1) instructed nursing staff to report to work in March even though they showed symptoms of COVID-19 and/or had tested positive for the virus; (2) failed to provide staff with PPE, including masks, gowns, and face shields; and (3) ignored COVID-19 safety protocols. Plaintiff also alleges that Westchester was repeatedly cited by state authorities in the years leading up to the pandemic for problems related to infection control practices. Although discovery will likely bear out what Westchester knew and when, the Court can reasonably infer from the allegations in the complaint that Westchester exhibited a reckless disregard for Claybon's health and well-being, or

10

worse, knew that exposing Claybon to symptomatic nurses would cause her to contract the virus.

Westchester advances a few final arguments, but none are persuasive. According to Westchester, Count II should be dismissed because the allegations neither describe the symptoms that members of the nursing staff experienced, nor demonstrate how the decisions made by administrators caused the virus to enter the nursing home. Westchester also argues that many of the events giving rise to Count II occurred days or weeks before state and federal agencies provided the public with recommended safety protocols.

While it is true that the allegations do not describe specific symptoms, the complaint does point out that Westchester knew one member of the nursing staff was hospitalized and another tested positive for COVID-19. The complaint also alleges that Westchester required the infected employees, along with other symptomatic nurses, to report to work during the weeks preceding Claybon's death and did not provide them with PPE. These allegations plausibly demonstrate that Westchester is responsible for introducing the virus to its residents. And as it concerns the timeline of events, the Center for Medicare & Medicaid Services allegedly issued pandemic-related guidance designed specifically for nursing homes days before Claybon reported her symptoms. The Court can reasonably infer, then, that Westchester generally knew in early-to-mid March what steps it could and should take to protect its residents.

To be sure, the allegations in the complaint might not be enough to *prove* that Westchester engaged in "willful" misconduct. Indeed, the initial weeks of the pandemic were marked by uncertainty and confusion, and we know far more about COVID-19 today than we did in March 2020. But at this stage in the proceedings, Plaintiff's allegations are enough to "'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Westchester's motion to dismiss Count II is therefore denied.

One final note before the Court turns to Westchester's motion to strike. Plaintiff maintains in her complaint and opposition brief that Governor Pritzker's March 9 proclamation is unconstitutional, as is an executive order issued on May 13, 2020. *See, e.g.*, R. 1 at 12 n.12; R. 23 at 7. However, Plaintiff does not seem to be asking the Court to determine whether the declarations are, in fact, constitutional. Indeed, her complaint focuses on Westchester's alleged misconduct and her opposition brief seems to assume that the declarations are constitutional. But to the extent Plaintiff is challenging the constitutionality of the March 9 proclamation and May 13 order, she should clarify as much at the parties' next status hearing and determine whether she has complied with Federal Rule of Civil Procedure 5.1, which places certain requirements on a party challenging a state statute.

## II. Motion to Strike

Rule 12(f) permits a court to strike "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike are generally disfavored and usually denied. *See Porter v. International*

12

*Business Machines Corp.*, 21 F. Supp. 2d 829, 831 (N.D. Ill. 1998). Before the Court will strike portions of a complaint, the moving party must demonstrate that "the challenged allegations are so unrelated to the present claim as to be void of merit and unworthy of consideration." *Kies v. City of Aurora*, 149 F. Supp. 2d 421, 427 (N.D. Ill. 2001). Courts also consider whether the allegations at issue "cause some form of significant prejudice to one or more of the parties." *FDIC v. Giannoulias*, 918 F. Supp. 2d 768, 771 (N.D. Ill. 2013) (citation omitted). The decision whether to strike material under Rule 12(f) is within the Court's discretion. *Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009).

Westchester moves to strike nearly fifty different allegations in the complaint. Although some parts of the complaint are repetitive and irrelevant, the Court declines Westchester's invitation to strike the allegations other than three—paragraphs 19, 25, and 110.

Paragraphs 19 and 26 refer to a holding company that supposedly managed Westchester and provided professional services to the nursing home. The holding company is not mentioned anywhere else in the complaint nor is it listed as a party. Furthermore, Plaintiff has not explained why the company is relevant to her claims. The Court therefore strikes paragraphs 19 and 26 as immaterial. The Court similarly strikes Paragraph 110, which alleges that police officers arrested a Westchester employee after she physically assaulted and robbed an elderly resident. The allegation has no relevance to Plaintiff's claims, and the Court questions why the allegation was included in the complaint other than to stir emotions. Because

13

Paragraph 110 is immaterial and scandalous, the Court grants Westchester's motion to strike it.

The Court otherwise denies Westchester's motion for the following reasons.

**The Introduction Section**: Westchester moves to strike the introduction section of the complaint, contending that it is argumentative and conclusory. It should hardly come as a surprise that the introduction section of a complaint attempts to frame a plaintiff's version of events. The Court therefore declines to strike the introduction section here, especially since it is no more than two paragraphs and barely takes up an entire page.

**Paragraphs 7, 8, 17, 18, 24, 25, and 28** largely describe various state statutes and Westchester's obligation to follow those statutes. Westchester argues that the paragraphs should be stricken because they are legal conclusions. While Plaintiff cannot rely on legal conclusions in pleading her case, she is not barred from including such conclusions in her complaint. *Walker v. Walker*, 2011 WL 3757314, at *1 (N.D. Ill. Aug. 25, 2011); *see also Spearman Indus. Inc. v. St. Paul Fire & Marine Ins. Co.*, 109 F. Supp. 2d 905, 908 (N.D. Ill. 2000) (declining to strike legal conclusions). Furthermore, the paragraphs in question are far from prejudicial. For example, paragraph 7 states: "At all relevant times to this Complaint, there was in full force and effect, a statute known as the Nursing Home Care Act, as amended ("the Act"), 210 ILCS 45/1-101 *et seq*." Responding to this paragraph will involve far less time and resources than what was required to file this motion.

**Paragraphs 11, 12, 13, 14, 15, and 16** allege that Westchester was not rendering assistance to the State of Illinois in response to the COVID-19 outbreak. Westchester claims that these paragraphs are part of an "apparent effort to plead around the immunity protection" provided by the Executive Order, and further claims that whether the Executive Order applies to Westchester is a question of law. But as stated earlier, whether Westchester actually rendered assistance to the State in response to the pandemic is a question of fact—Paragraphs 11-16 allege that Westchester did not render assistance, while Westchester maintains that the nursing home "attempt[ed]" to help. The Court therefore declines to strike the paragraphs in question.

**Paragraph 30** alleges that Westchester was incentivized to maintain the highest possible occupancy level at the expense of patient care. Westchester claims that its business motivations are irrelevant. There is some merit to this argument. But Paragraph 30 alleges that one area of patient care that was minimized in favor of additional revenue was the procurement of PPE. Since PPE is widely regarded as an essential resource in protecting against COVID-19, and since Plaintiff alleges that members of Westchester's nursing staff were not given PPE in the weeks leading up to Claybon's death, the Court declines to strike Paragraph 30.

**Paragraphs 73 through 88** allege that Westchester was cited by the Illinois Department of Public Health between 2011 and 2019 for various regulatory violations concerning infection control practices. Westchester claims that the paragraphs should be stricken because they are inadmissible hearsay. At this initial stage in the

15

proceedings, the Court does not consider what evidence might be admissible at trial. Issues related to hearsay and admissibility usually come into the picture starting at summary judgment. *See Wilbern v. Culver Franchising Sys., Inc.*, 2015 WL 5722825, at *7 (N.D. Ill. Sept. 29, 2015). Westchester also argues that the paragraphs should be stricken because they are irrelevant. Plaintiff responds by pointing out that the specific violations are related to infection control, and thus bear some connection to Claybon's death. The Court sees merit in both parties' arguments. On the one hand, whether the nursing home was negligent in caring for Claybon does not seem to turn on public health citations issued years before she died. On the other hand, and as discussed in response to the motion to dismiss, the previous citations specifically concern infection control protocols—an issue that is somewhat relevant to Claybon's death. Should the parties move for summary judgment, nothing will prevent them from arguing over the relevance of the citations. In the meantime, because the citations are not "so unrelated to the [] claim[s] as to be void of merit and unworthy of consideration," *City of Aurora*, 149 F. Supp. 2d at 427, the Court declines to strike Paragraphs 73 through 88.

**Paragraphs 109 and 111** allege that other residents, besides Claybon, died at Westchester as result of COVID-19. Westchester contends that the allegations are irrelevant. The Court largely agrees—simply because other residents died from COVID-19 does not necessarily mean that Westchester was negligent in caring for Claybon. But as stated earlier, should this case proceed to summary judgment, Westchester can argue that the allegations do not support Plaintiff's claims.

16

**Paragraph 133** is over two pages in length and lists more than twenty-five different statutory and regulatory provisions concerning nursing home safety. Westchester argues that all two pages should be stricken because there are no allegations that the nursing home actually violated any of the listed provisions. As a preliminary matter, the Court sees little value in Plaintiff's practice of copying and pasting the text from twenty-five different legal provisions into the body of the complaint. Some of the legal provisions cited are barely relevant to the case; for example, the complaint cites 210 ILCS 45/2-108(a), which purportedly requires a nursing home administrator to ensure that "correspondence is conveniently received and mailed, and that telephones are reasonably accessible." This "everything but the kitchen sink" approach to complaint drafting is not an efficient way to litigate a case. In any event, there are some regulatory provisions listed in Paragraph 133 that are supported by allegations in the complaint, such as 77 Ill. Admin. Code, Ch. 1 § 300.1210, which requires nursing homes to provide "adequate" nursing care "to each resident" of the facility. Absent a request from Westchester to strike specific sub-sections of Paragraph 133, the Court is not going to investigate each legal provision and determine which relate to Plaintiff's claims and which are supported by factual allegations.

**Paragraphs 134, 135, and 136** allege that Westchester failed to implement specific procedures related to infection control and COVID-19. Westchester complains that the paragraphs are not supported by factual allegations. Like Paragraph 133, Paragraphs 134-136 illustrate the "everything but the kitchen sink" approach to complaint drafting; nearly fifty different procedures are listed and many (but not all) appear to be either

17

unsupported by factual allegations or largely irrelevant to Plaintiff's claims. But again, the Court is not going to strike several pages from the complaint absent a more specific request from Westchester.

**Paragraphs 137(d), 137(j), 137(l), 137(m), 137(u), 137(v), and 137(aa)** allege that Westchester failed to engage in series of acts or omissions related to COVID-19 safety protocols. Westchester contends that the paragraphs are either duplicative or irrelevant. The Court agrees that several of the paragraphs are duplicative. For example, Paragraphs 137(j) and 137(u) contain the same or similar allegations as Paragraph 137(i). While Rule 12(f) allows a court to strike any "redundant" matter, there is no compelling reason to strike the sub-paragraphs at issue here since doing so will only create make-work for the parties. The Court is "capable of disregarding any extraneous [] allegations." *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 2004 WL 1730332, at *5 (N.D. Ill. July 30, 2004) (denying motion to strike). Furthermore, the Court disagrees with Westchester's contention that Paragraph 137(d) is irrelevant. Paragraph 137(d) alleges that Westchester failed to screen all residents, including Claybon, for COVID-19 symptoms. If true, that allegation is relevant to the question of whether Westchester acted negligently in keeping Claybon safe from the virus.

* * * * *

Westchester contends that declining to strike the above-mentioned paragraphs may require the nursing home to engage in vast and burdensome discovery. The Court recognizes this concern and reminds the parties that Rule 26(b)(1) limits the scope of the discovery to matters that are "relevant" to a claim or defense and "proportional" to the

needs of the case. In other words, the "discovery rules are not a ticket to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest." *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 365 F. Supp. 3d 916, 925 (N.D. Ill. 2019); *see also Emp. Opportunity Comm'n v. Union Pac. R.R. Co.*, 867 F.3d 843, 852 (7th Cir. 2017) (discouraging "fishing expeditions"). The parties are strongly encouraged to keep this in mind as they make their way through the discovery process. Indeed, the mere fact that the Court will not strike certain paragraphs in the complaint does not necessarily mean that the information contained in those paragraphs are automatically discoverable. If Plaintiff's complaint was more concise, the Court would not feel compelled to make this point. Overreaching discovery requests, after a meet and confer to limit them, should be brought before the Court in an appropriate motion for a protective order.

## Conclusion

For the reasons stated in the opinion, the Court denies Westchester's motion to dismiss, and denies in part and grants in part Westchester's motion to strike. R. 14. A status hearing is scheduled for April 5, 2021 at 9:00 A.M. The parties have already submitted an agreed-upon fact discovery schedule, which they should be prepared to discuss at next week's hearing.

ENTERED:

*Thomas M Durkin*
_____
Honorable Thomas M. Durkin
United States District Judge

Dated: April 1, 2021